afternoon. Judge Hardeman, can you hear us? I can. Awesome. Great. All right. So we'll call our only case this afternoon, United States versus Lingala number 22-2060. And we'll hear from Pelt's attorney. Oh, yes, by all means approach, approach the podium. And I would ask if I could reserve three minutes. That'll be granted. I may please the court. I would start, I think, kind of in seriatim in terms of what we had briefed. And obviously, the first issue is what we essentially think is the quite unusual and egregious conduct by the government in terms of the unlawful, what we think is an unlawful search and seizure of Mr. Lingala, who at the time was a pretrial detainee. And while the court, the lower court, never really addressed the issue, and perhaps I shouldn't assume, but I think the government may have conceded that, in fact, Mr. Lingala did have a Fourth Amendment right as a pretrial detainee, and in fact, even as a an inmate in a facility. The fact of the matter is, the fact of the matter is, the judge, the lower court, never got to that issue. They determined that because the government was not going to use, by their own election, not going to use the offending documents, that therefore the issue was moved. But it wasn't, because really there were two sanctions that needed to be in place. So there were two remedies that we were seeking. If we could address, counsel, how is it that your client has been prejudiced as a result of what you're telling us? Understood. The mootness in and of itself wasn't appropriate. What needed to happen is there needed to be the second problem, which the attorney at the time asked for, and that was disqualification of the prosecution team. Not the U.S. Attorney's Office, but of the prosecution team. Because the prejudice occurred once the 470-something or 90-something documents that were non-privileged were presented or deemed to be non-privileged by the Taint team were presented to the prosecution team, the two attorneys who prosecuted the case. At that point, that's where the prejudice occurred, because based on their review of those documents. Well, I understand that may be the time it occurred, but what is the actual prejudice to your client? The prejudice is quite simply, rather, Your Honor, that they had the benefit of our client's thoughts. Quite literally plucked the thoughts out of his head. He was prolific. Like we indicated, there was about 900, 950 pages that were taken. I think it's a bit unlawfully from him. They were taken. Of those 900 pages, approximately half, give or take, were privileged. The remaining, albeit I think there was one privileged document that slipped through, the others were his musings, his thoughts. Information that he provided to counsel, and information that he provided to previous counsel, the first lawyer that had the case. We had actually tried it, but the fact of the matter is, these documents contained information that laid out his defense, or at least what he thought his defense was. In particular, laid out his entrapment defense. They had, the government had the benefit. So the prejudice is difficult to completely determine, because quite frankly, that's a question or an answer that maybe the trial team needs to provide. But the fact is, you know, so that's the first prejudice. I just want to make sure I heard you say something a moment ago correctly. Did you say that the documents, those other 400 and whatever pages of documents, were not privileged? There was a determination by the Tain team that 400, and again, the number is almost 50%, but half the documents approximately were determined to be attorney-client privilege, because on their face they contained information that indicated it was communication with counsel. And the remaining documents were not determined to be privileged, but they had his thoughts. Maybe not counsel's thoughts, but certainly his thoughts after speaking with counsel. But they had his thoughts about the case. I understand that the Tain team determined that, but I just want to make sure there's no dispute. You're not arguing that those documents were privileged? They were determined, no. They were determined not to be privileged, and on their face, I don't believe that the Tain team acted inappropriately on its face. But again, reviewing those documents, one could easily see that they had his views about what his defense should be, what type of jurors he would select. All of those things were included in those 450 pages. It wasn't just case law. They were, like his original counsel said, they were his inner thoughts that were just essentially plucked from his head, unlawfully. In the manner in which they were plucked from, you know, they were obtained by counsel. So the disqualification should have been the appropriate remedy. And again, disqualification of the trial team... Pretty high bar, though, to get to disqualification, isn't it? Well, Judge, the fact of the matter is we don't know... Yes, it would be a relatively high bar. But, Judge, I think this is an extremely unique situation where the search was essentially ordered by the FBI, had nothing to do with prison safety. So it really was an egregious act, and it ultimately compounded when the FBI turned over the file, not to defense counsel like in Scarfo, or not to the court like in Scarfo, but turned it over to a Tain team. And then the Tain team turned it over to the trial team without any conversations with counsel, without any conversations with the court. And because the lower court was satisfied that based on the representations of the government that they would not be utilizing those documents, she deemed it to be moot. And I don't think that that was... There was no inquiry made, Your Honor. So when you ask, it's a high standard. The fact of the matter is this was not a fully developed record. And that's part of it. In fact, that's one of the standards on why we think it would be a plenary or a de novo undertaking. Well, so you're saying the district court's opinion was arbitrary then? Yes. Well, I guess. Yes, Judge. And in fact, I think it was devoid of any analysis. And I don't mean that. I think the judge is very thoughtful. But on that issue, the judge determined that because it was moot, she never addressed the other issue, which clearly was outlined to her. And that is disqualification. So she never was able... She never... There's not a single piece of evidence in the lower court record that suggests that there was any balancing analysis that was done. And of course, the balance would be the right to counsel, the government's right to counsel versus the unlawful intrusion. The egregious, extensive unlawful intrusion. Because, you know, Your Honor, the fact of the matter is this was not... Again, we talked about this not being a public safety issue. We talked about this being a situation where the case was transferred from state to federal. The moment the FBI or the agents get involved, they take the file. He's no longer there. So the seizure, while the seizure may have been appropriate, once they found there was no contraband, it was just 500 pieces of paper, 1,000 pieces of paper in four envelopes concealed in an envelope. Not just in an envelope, but there was an effort to protect his documents by Mr. Langala. Once they determined there was no contraband, I think at that point, it should have been returned. Not I think, it should have been returned. And instead, there was a diligent search weeks, months afterwards. What institutional purpose did it serve? And in fact, it had nothing... Well, they put it through a privilege review, right? It may not have been perfect, as we know, but... Yeah, but Judge, I think, you know, I think that privilege review should be in the hands of defense counsel and maybe courts, not in the hands of a tank team. I mean, the fact of the matter is, while I say that this may not have been privileged material, and I don't believe we argued that. I think it would have been a little bit of a different posture. We really... It really was privileged. It was his thoughts. And while it may not have been protected as attorney-client privilege, because it wasn't authored by the attorney. It didn't say work product on top of it. It didn't do any of those things. The FBI, and more importantly, more importantly, the defense team had no business knowing about what our defense was before we even knew what it was. And I think that that's the problem. There's egregious conduct. There was an extensive and unlawful intrusion. And the lower court compounded the issue by not even offering a balancing test. So I think... I'm sorry. Counsel, am I correct in understanding that none of the documents seized from your client was used by the government at trial itself? Judge, again, I know what you're asking. I think semantically, it was used. That's our point, that they used his inner thoughts. And his inner thoughts were important to us. We relied on them. But in terms of a document being used, the answer is yes, it was used. But the government argued they obtained it from an independent source. The government argued that they obtained it from his co-defendant. The letters that comprised the sole basis of count three, that they obtained those from his co-defendant, who, by the way, had them taken from her in a very similar fashion. Let's set aside Ms. Reddy for a minute. Was it exclusive of her were any of the documents admitted into evidence at trial? Were any of them... I know your argument is that they were used in the sense that the government took advantage of his thought processes. But am I correct in understanding that none of the documents seized from Mr. Lengel was actually proffered before the court in evidence? The documents... His letters were introduced into evidence both in the grand jury and at trial. But again, trial counsel made representations, and I have no reason to doubt their representations, that those same documents were obtained from Reddy. The letters that comprised the sole basis of count three, and I believe even four, the witness tampering. And of course, that's another issue that we talked about in terms of the witness tampering, which we think was completely pervasive. So it didn't just limit itself to count three. But we have these letters that, again, were obtained, which we think at the very least in an improper format, at least with respect to Ms. Reddy. And we acknowledge we don't have standing for that. But the fact of the matter is they were then used and utilized in violation of what we believe to be hearsay, 403 analysis. But probably most importantly and significantly is confrontation. Because they chose not tactically not to call Ms. Reddy. And instead, they had an agent who had no knowledge, no independent... Why is that a violation? I mean, the statements are not Ms. Reddy's statements, right? They were allegedly Mr. Lengel's statements, right? And in fact, the lower court, that was the basis that the lower court said, they're Mr. Lengel's statements. But what we were referring to is the authentication of the document, that they were read and received by Ms. Reddy, that they satisfied the element of corrupt intent, which certainly the agent couldn't testify to. But also... Why would Ms. Reddy be able to testify to Mr. Lengel as a corrupt intent? Well, first, at the very least, she should be able to testify that she received them. Is there an element of the crime that requires that she testify that she received them? No, no. In fact, most of the cases that were cited by the government, the recipient actually did testify. But I did acknowledge that there was no... They didn't have to be... Certainly, she didn't have to be in fear of them. That was not necessarily an element. But there has to be corrupt intent, corruptly persuasive. And we argue that on their face, the point is that on their face, the documents didn't say, I'm going to kill you if you do X, or I'm going to kill you if you do Y. He certainly is entitled to express his displeasure. That's the persuasive element. And he's entitled to talk about, in a persuasive way, why she should not testify against him or why she should not do certain things. But it has to be the corrupt intent. And that's where she comes into play, in terms of what these things meant to her. Because the documents themselves don't say, I'm going to kill you or I'm going to do any of these things to you. Anything illegal. It's the implication behind them. And again, we were just left with the agent testifying, putting them together like a puzzle, by the way. And then, on top of it, her never showing up and leaving the impression with the jury that she either was incapable of or fearful, thereby being the corrupt intent. When that was not the case, it was a strategic decision. It was a strategic decision the government made not to call her. Well, you could have called her as a witness, right? Judge, we could have called her. Sure, we could have called her. And that's a little bit easier in practicality than it may sound. Because obviously, it's not a witness that we have access to. So yes, theoretically, we could have called her. But again, the government made a strategic decision not to call her, for the same reasons that perhaps we would not have called her. But the fact of the matter is, it's their burden. It's their case. And we argue that calling the agent to kind of put this together and lay it out there and throw it into the jury for their consideration was completely inappropriate. And that's why it violated the Confrontation Clause. Not necessarily that we couldn't cross-examine him, but that we couldn't cross anybody about what the documents meant, whether they were mailed, whether they were written by my client, whether they were received by Ms. Reddy, and whether they were read by Ms. Reddy. Because there's no crime unless any of those things occur. And we had no way of crossing that. And we told the judge that. And then, to compound the issue, and I— You had no way of crossing it because you didn't call her as a witness. Is there any case that supports the argument that a witness who the defense could have subpoenaed to testify at trial, but the evidence was put in through documentation rather than witness testimony? Is there any case out there that says that's a Sixth Amendment violation? Well, perhaps not framed like that, there wouldn't be. But the fact of the matter is, we don't have the burden to do anything. We don't have to carry the government's weight. And so, yes, we also made a strategic decision not to call Ms. Reddy. I would submit that she was someone that probably wasn't going to speak to us anyway. So we'd be calling her on the stand for the first time. But we made a strategic decision also not to call her. But again, we don't have the burden of proof. And I don't think the only— Judge, the only piece that I disagree with is— The only piece I disagree with is the letters in and of themselves did not carry the day. Because I don't think it satisfied the elements because of the issues that I mentioned. We were just left— It sounds like you're making a—that sounds like a new argument. That sounds like a sufficiency of the evidence argument. You're saying that without Reddy's on-the-stand testimony, the documents that were put in were insufficient to satisfy the elements of the offense. Is that your argument? Well, the argument is—in a way, Your Honor, and we do make that argument. We did say that we felt that we needed Ms. Reddy— We needed to be able to cross Ms. Reddy so that we can address that element. I think what I'm arguing—and I understand Your Honor's point. And I think what I'm arguing really is that it— Not that it was maybe completely insufficient in terms of evidence, but it really unfairly hampered our ability to really mount a vigorous defense. And the answer shouldn't be on top of some of this— What happened prior to counsel being involved, where the government plucked his thoughts and these documents from him. The answer shouldn't be that we have to then compound the error by calling people that we really probably have no business calling. The idea is that we wanted to be able to confront the witnesses that we had available to us. And certainly, Ms. Reddy was available to the government. And they chose strategically and tactically not to call her. And we were left with the really untenable task of not really being able to cross-examine anyone about those elements. All right. Counsel, you're over time. I understand. So we'll hear from you on— I'm sorry. I'm sorry. Thank you. Okay. And we'll hear from the government.  I'm Assistant U.S. Attorney Sabrina Camazoli on behalf of the government to appellee in this matter. I'd like to begin, if I might, by talking about Judge Wolfson's disqualification ruling. First of all, the defendant asked for a pretty severe remedy of disqualification. And like any remedy a court may impose, it has to be tailored to the harm. And here, the harm was purely theoretical. And Judge Wolfson understood that because the defense did not put forth anything within those 434 pages that went over to the prosecution team that actually constituted defense strategy. Had they done so, and had they made some connection between a piece of paper that the prosecution team had and how they may have used that against him, used his own defense strategy against him, they would have made a showing that some kind of remedy, like disqualification, was merited. And at that point, Judge Wolfson could have then asked the government to independently source everything it used at that moment, leading to the charges. Now, interestingly, that's exactly what Judge Wolfson did. She almost assumed prejudice. She almost assumed there had actually been an intrusion into Lynn Galla's thought processes. And then she did ask, right before making her disqualification determination, she did ask the government to go step by step through how it obtained the evidence that it had used against him to bring the charges of witness tampering. And the AUSA was able to articulate how the government obtained its evidence. It came from letters. Those letters had been written from Lynn Galla to Reddy. They came from Reddy herself. They came from Reddy's counsel. And they came from Reddy's cell. And Reddy never raised a Fourth Amendment issue with regard to the seizure of documents from her cell. After the judge was satisfied that the government had not used any of the 434 pages, she determined that no disqualification was required. And that was the balancing. When you have really no harm or no injury to redress on one side of the equation, and the extreme remedy of disqualification on the other side of the equation, there really was nothing else for her to consider before making her determination. And Judge Hardiman had asked, were any of the documents that were seized, used during, or admitted during trial? And I suspect the answer is no. Or perhaps they were derived from an independent source. To the extent they were. Correct. So the 434 documents were themselves never used at trial. The trial team made no derivative investigative use of any of those documents. Did not use them for impeachment purposes. Used them for no purpose whatsoever. I believe that at this point, having had those 434 pages of documents for four years, if the defense believed one or more of them actually revealed Lynn Gallis' thought processes, we would have seen that document. That document would have been presented to Chief Judge Wolfson so that she could make a determination on disqualification. But no such document was ever presented. Your friends on the other side argue that the practice of using a filter team, I believe they argue that the practice of using a filter team was an issue. That is, those documents should have been handed over to the court or his counsel rather than a filter team to make the decision. Can you just respond to that argument? I would be happy to. Thank you, Your Honor. As this court knows, filter law has been evolving for several years. And this court has sanctioned the use of a U.S. Attorney's Office in-house filter team to filter documents. This filter here fell short of our office's best practices in two respects, which I would like to explain because I am sure it concerns this court as it concerns our office. The first way that this filter fell short of our best practices that exist today as well as existed back then is that it appears that the first privilege determination was made by an agent as opposed to an attorney. An AUSA or an attorney should always be making a privilege determination. We should not rely on an agent to do so. The second way in which this filter fell short of our expectations is that there was no engagement with defense counsel in real time. When an investigation or prosecution is overt as this was, we make every effort to engage with defense counsel in the first instance to agree on filter terms. In this case, that did not happen. I don't know why it did not happen. I only know that at the time, Lingala was taken from state to federal custody. He was represented by an attorney in the state. Once he was brought into federal court, he was temporarily represented by an assistant federal public defender. And then eventually, Mr. Bellarato, his first federal counsel, was brought on board. And I don't know why during that time period, the filter AUSA did not reach out to defense counsel. By the time she reached out to defense counsel, it was Mr. Bellarato. And it was about three weeks after the prosecution team had already received the documents she had designated as not privileged. However, as this court knows, U.S. attorneys' offices do use in-house filter teams quite regularly. We have very high standards. I know this court expects us to meet those high standards, and we continuously strive to do that. Do you have any other questions, Your Honor? No further questions for me? None from me. Judge Hardiman? I have a question about Archer. If we accept your argument on that issue, would we be required to create a circuit split with the Second Circuit? No, Your Honor. I don't think that this court even has to consider Archer. The circumstances there are so different from the circumstances here involving federal jurisdiction and the interstate nexus. Here, the government has satisfied the interstate nexus on the murder-for-hire count in at least four different ways. Obviously, he traveled of his own accord from Indiana through Pennsylvania to New Jersey to engage in a murder-for-hire scheme. He did so using his cell phone, his girlfriend's cell phone, the internet, and a car. All facilities of interstate commerce that create the jurisdiction here. In Archer, which is a very different situation, the government, it was found, essentially manufactured jurisdiction by sending an agent outside of state lines to make interstate phone calls into the state where the targets were. This is so unlike Archer. I don't even think Archer is on point and needs to be considered in this court's determination of that claim. Is there any evidence in the record that the agents lured him to New Jersey from Indiana? Everything in the record is essentially on tape. There are audio-recorded conversations between Langala and the agent, and there are text messages between them, all of which the jury heard. In those, Langala said he would be coming back to New Jersey in a few weeks for whatever reason he had to come back to New Jersey. And it was then that he wanted to meet with the undercover, who he thought was a hitman, in person to discuss this in person. He did not want to discuss it over the phone, probably because he knew it was illegal. So he is the one who says, I'm coming back to New Jersey, I'm traveling from Indiana, and I will meet you there. Let me know where to meet you. It wasn't as if the agents lured him back. The agents, they could have come up with this scheme by phone from Indiana to New Jersey, and they didn't. He came back of his own accord. One other question. You argued that Langala waived the Rule 403 argument, and I'm not sure I understood the support for that, because it seemed to me that he did in fact check the evidence as inadmissible under Rule 403 at trial. What I believe he waived was raising, as he did on appeal, a series of factors that the court should have considered in making the 403 determination. He did not raise those factors below. However, when Judge Wolfson made her 403 determination, the probative value of that evidence was tremendous. Those letters were not just there to show consciousness of guilt. Those letters were the crime charged. Those letters constituted the witness tampering. So they were highly, highly probative. Thank you. No. Okay. Thank you, counsel. Thank you very much. If I can just pick up, and I thank you for your indulgence. If I could just pick up on areas that maybe I didn't speak too much about and that Your Honor had inquired about. The 403 analysis. I mean, we vehemently argued 403. And in fact, the response that I got, not once but twice, was you're stuck with your client's own admissions. That was the analysis of 403 that the court did. I don't know what more we could have done in the course of a trial with a jury sitting right over our shoulder in terms of arguing United States versus Guerrero, perhaps. But the fact is, we asked for an analysis to be done, both in writing and at the time at a sidebar. So I don't think we waived anything. And in fact, we vehemently argued for 403. As far as the manufactured jurors. Counsel, it's true, is it not, that you did not place the Guerrero factors directly at issue in the district court. You did not mention Guerrero to the district court. Is that right? I would think by name we did not mention Guerrero, no. But we certainly... Your point is, yeah, we didn't name the case, but we made the argument. And under our precedent in Joseph, making the argument is enough. You don't have to specifically identify the case by name. Is that your point? That's my point. And absolutely, on our feet, we did not mention Guerrero. But yes, that's certainly the point. In terms of manufactured jurisdiction, Judge, it's actually very similar to Archer. Since you asked the question about what was in the record, the fact of the matter is, all of the contacts, the main cooperator literally blows trial. You see it today, it's all on tape. He blows trial. He then turns... Plan B is I'm going to implicate this poor guy who's yelling about being incarcerated for matrimony or for being behind on his alimony. All of the conversations take place, or at least all of the meetings take place in New Jersey. It was investigated by local law enforcement. None of the calls were ever initiated by Mr. Lingala. They constantly reach out to him. Are you sure? You got to do this. They create this hitman. You know, he's waiting. The time is running. The time is running. So really, what happens is while the government, the agents didn't go out of district to call him to create jurisdiction. What they did is they called Mr. Lingala, who was out of district at the time. He was living in New Jersey, but told them, I don't want to deal with this until I get back. He kept putting them off. They may have called him 30, 40 times unsolicited, where he never calls them. They were trying to manufacture a case. I understand why. I understand why they were trying to manufacture or at least address this, because they were concerned. There were some safety concerns. But in terms of jurisdiction, once it goes to the feds, that's where I think the jurisdiction is lost, because the call, while it's not the agent making the call from the outside, they're calling Lingala from the outside. Everything else occurs in the state of New Jersey. And he told them that. I don't want to deal with this right now. I'm busy. I'm away on business. I'll come back and we'll deal with it. But that wasn't good enough. That leads to this entrapment. Time's up, counsels. But do you want to wrap it up? Your Honor, it leads to the entrapment defense when the question is in terms of what would have been or should have been presented. It is very clear that Lingala laid out in those documents that should have been the subject of an inquiry, laid out his entrapment defense, which as the court well knows, we did not have to present as an affirmative defense until our case, until we closed any of those things and the government knew where we were headed from day one. That's part of the prejudice that occurred. Thank you. Thank you, counsel. We'll take this case under advisement. Thank counsel for their excellent arguments today and your briefing. And we'll ask that the clerk adjourn court for the day. Thank you. Thank you.